## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

ROBERT HOSSFELD, individually
and on behalf of others similarly situated,

         *Plaintiff*,

      v.

AMERICAN FINANCIAL
SECURITY LIFE INSURANCE
COMPANY, FEDERAL INSURANCE
COMPANY, HEALTH INSURANCE
INNOVATIONS, INC., SUPREME
HEALTH GROUP INC., BLAKE
FISHMAN, MED-SENSE
GUARANTEED ASSOCIATION,
NATIONAL CONGRESS OF
EMPLOYERS, INC., NATIONAL
BENEFIT BUILDERS, INC., HEALTH
ADVISORS OF AMERICA, INC.,
MICHAEL SMITH, and ZACHARY
COX,

         *Defendants*.

**CLASS ACTION**

**JURY TRIAL DEMANDED**

_____/

## CLASS ACTION COMPLAINT

1.     Plaintiff Robert Hossfeld ("Plaintiff") brings this action against Defendants American Financial Security Life Insurance Company, Federal Insurance Company, Health Insurance Innovations, Inc., Supreme Health Group Inc., Blake Fishman, Med-Sense Guaranteed Association, National Congress of Employers, Inc., National Benefit Builders, Inc., Health Advisors of America, Inc., Michael Smith, and Zachary Cox, (collectively, "Defendants") to secure redress for Defendants' practice of causing calls to be made to the cell phone numbers of

Plaintiff and others using an automatic telephone dialing system and prerecorded voice, in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.

## INTRODUCTION

2.     Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective. However, this technology also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telemarketing abuses.  As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers…. Banning such automated or prerecorded telephone calls … except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

3.     As is relevant here, federal law under the TCPA prohibits "mak[ing] any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service[.]" 47 U.S.C. § 227(b)(1)(A)(iii).

4.     To demonstrate a violation of the TCPA, the Plaintiffs need only show that Defendants called a number assigned to a cellular telephone service using an automatic dialing system or prerecorded voice. *Breslow v. Wells Fargo Bank, NA*, 857 F. Supp. 2d 1316, 1319 (S.D. Fla. 2012).

5.     The TCPA provides for injunctive relief and the greater of actual damages or

2

$500 per violation, which can be trebled where the statute was "willfully or knowingly" violated. 47 U.S.C. § 227(b)(3).

6.     Defendants caused multiple, unsolicited, automated calls to be made to Plaintiff's cell phone, and Plaintiff files this class action complaint on behalf of himself and others similarly situated, seeking relief from Defendants' illegal calling practices.

## JURISDICTION AND VENUE

7.     This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 with respect to Plaintiff's TCPA claims. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012). Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2) because Plaintiff alleges a national class, which will result in at least one class member belonging to a different state than that of Defendant. Plaintiff seeks up to $1,500.00 (one-thousand-five-hundred dollars) in damages for each violation of the TCPA, which, when aggregated among a proposed class numbering in the tens of thousands, or more, exceeds the $5,000,000.00 (five-million dollars) threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA"). Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

8.     The Court has personal jurisdiction over Defendants and venue is appropriate in this District under 28 U.S.C. § 1391(a) because Defendants do business in this District, Defendants American Financial Security Life Insurance Company, Supreme Health Group Inc., Fishman, Health Advisors of America, Inc., Smith, and Cox are headquartered or reside in this District, because Defendants directed the calls that are the subject of this lawsuit to Plaintiff and others in this District, and because a substantial portion of the events giving rise to this cause of action occurred in this District.

## PARTIES

9.      Plaintiff Robert Hossfeld is a natural person and a citizen of the State of Texas. At all relevant times, Plaintiff was the subscriber and sole user of the cellular telephone at issue.

10.     Defendant American Financial Security Life Insurance Company ("American Financial") is a Missouri corporation headquartered at 55 NE 5th Avenue, Suite 502, Boca Raton, Florida 33432.

11.     Defendant Federal Insurance Company ("Federal Insurance") is an Indiana corporation headquartered at 251 North Illinois Street, Suite 1100, Indianapolis, Indiana 46204.

12.     Defendant Health Insurance Innovations, Inc. ("HII") is a Delaware corporation headquartered at 15438 North Florida Avenue, Suite 201, Tampa, Florida 33613.

13.     Defendant Supreme Health Group Inc. ("Supreme Health") is a Florida corporation headquartered at 1100 Park Central Boulevard South, Suite 2600, Pompano Beach, Florida 33064.

14.     Defendant Blake Fishman is a natural person and a citizen of the State of Florida, who resides, on information and belief, in Broward County, Florida. On information and belief, Mr. Fishman directed, controlled, and had authority over Supreme Health's acts alleged herein, including in relation to the calling with Plaintiff and the class.

15.     Defendant Med-Sense Guaranteed Association, Inc. ("Med-Sense") is a Delaware corporation headquartered at 16476 Wild Horse Creek Road, Chesterfield, Missouri 63017. Med-Sense maintains a registered agent in Florida at CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

16.     Defendant National Congress of Employers, Inc. ("NCE") is a Delaware corporation headquartered, on information and belief, at 100 Garden City Plaza, Suite 102,

Garden City, New York 11530.

17.     Defendant National Benefit Builders, Inc. ("NBBI") is a New Jersey corporation headquartered at 25 Hanover Road, Florham Park, New Jersey 07932. NBBI has a relationship with NCE to market NCE-branded health or insurance-related discount products and, on information and belief, coordinated the marketing of NCE memberships to Plaintiff and other class members.

18.     Defendant Health Advisors of America, Inc. ("Health Advisors") is a Florida corporation headquartered at 8140 NW 51st Place, Coral Springs, Florida 33067.

19.     Defendants Michael Smith and Zachary Cox are natural persons and citizens of the State of Florida. Mr. Smith and Mr. Cox reside in Broward County, Florida. They are the principals of Health Advisors. On information and belief, Mr. Smith and Mr. Cox directed, controlled, and had authority over Health Advisor's acts alleged herein, including in relation to the calling with Plaintiff and the class.

## FACTUAL ALLEGATIONS

20.     Defendants American Financial and Federal Insurance (collectively, "Insurance Companies") are insurance companies that do business in this District and across the country.

21.     The Insurance Companies acquire business through, among other things, using third parties to generate and facilitate leads of prospective customers, including by telephone.

22.     The Insurance Companies' lead generation calls follow a standard process and procedure: The Insurance Companies' accept marketing leads from lead generators, which make automated calls to prospective customers. Once the consumer answers and proceeds through an automated prompt to speak with a live agent, the lead generator's representative then vets the consumer's interest in insurance-related products, takes down the consumer's name, address,

health, and other pertinent information, and provides a quote for the Insurance Companies' insurance.

23.     After this initial intake, the consumer is then transferred to another representative – in the "verification" department – who confirms the consumer's information and causes an e-mail to be sent to the consumer containing application materials for the Insurance Companies the consumer is instructed to sign and submit. The Insurance Companies then pay their lead generators for the leads.

24.     The Insurance Companies' products are often solicited together as a package. For instance, as further detailed below with respect to Plaintiff Hossfeld, American Financial's AdvantHealth short-term medical ("STM") insurance was offered for sale to Plaintiff during the same call as accidental death and dismemberment coverage underwritten by Defendant Federal Insurance.  *See* Exhibit A (containing AdvantHealth STM application form e-mailed to Plaintiff during one of Defendants' calls).

25.     Further, many of the consumers to whom Defendants telemarket are deceptively upsold on non-insurance products, such as memberships in NBBI/NCE's or Med-Sense's "discount" plans. *See* State of Alaska Department of Commerce, Community & Economic Development, *The Division of Insurance Cautions Alaskans that Short-Term Health Insurance Is Not ACA Compliant* (Dec. 15, 2015) ("Health Insurance Innovations (HII) is an entity registered in Florida that is contacting consumers by telephone. The Division of Insurance records reflect that HII and agents known to be selling its products are not licensed in Alaska to sell insurance; their sales activities are in violation of Alaska licensing insurance statutes. The review by the Division of Insurance also noted that consumers purchasing products from HII were unknowingly purchasing membership in a non-insurance discount program called the Med-Sense

Guaranteed Association.").[1]

26.     In offering their insurance and other products and services for sale by telephone, Defendants caused autodialed and prerecorded-voice calls to be made to the cell phones of Plaintiff and other consumers, without the prior express consent of the called party.

27.     On information and belief, the equipment used to call Plaintiff and others not only had the capacity to store or produce telephone numbers to be called using a random or sequential number generator (and to dial such numbers), but was programmed to sequentially or randomly access stored telephone numbers to automatically call such numbers. These calls were made with equipment capable of dialing numerous phone numbers in a short period of time without human intervention, as part of an automated process. *See Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1052 (9th Cir. 2018), *cert. dismissed*, No. 18-995, 2019 WL 368840 (U.S. Feb. 27, 2019) ("[W]e conclude that the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically").

28.     On information and belief, Defendants used dialing system(s) that are automatic telephone dialing systems under the TCPA to place the calls at issue.

29.     Defendants also used a dialing system(s) that delivered prerecorded messages or an artificial voice to Plaintiff's and others' cell phones.

30.     The people to whom Defendants made or caused to be made autodialed or prerecorded-voice calls never expressly consented to receive such calls.

---

[1]     *See also* HII Form S-1 (SEC filed Dec. 20, 2012) ("[W]e have an agreement with … Med-Sense, a non-profit association that provides membership benefits to individuals and gives members access to certain of our products. Under the agreement, we primarily market membership in the association and collect certain fees and dues on its behalf. In return, we have sole access to its membership list, and Med-Sense exclusively endorses the insurance products that we offer.") (https://www.sec.gov/Archives/edgar/data/1561387/000095010312006865/dp34690_s1.htm).

31.     Defendants or those calling on their behalf sometimes called persons in association with calling efforts using their automatic telephone dialing system or unattended messages, after being notified that the person did not want to be called.

32.     On information and belief, many of these individuals were sent more than one call, and Defendants lack an adequate system for preventing autodialed or prerecorded-voice calls to phones for which it does not have consent.

33.     Defendants caused these calls to be made to Plaintiff and the other members of the class defined below intentionally. Defendants are well aware of the TCPA's prohibitions against use of autodialers and certain use of prerecorded voice technology in calls to consumers, but made the business decision to make these calls, anyway.

### Facts Relating to Plaintiff

34.     Plaintiff has received multiple automated and prerecorded calls to his cellular telephone from or on behalf of Defendants since approximately May 2018, including but not limited to on May 9, 2018, August 2, 2018, August 8, 2018, October 23, 2018, November 26, 2018, November 28, 2018, and February 13, 2019. Upon information and belief, there were other calls, too, including from before May 2018.

35.     For example, Plaintiff received a call from or on behalf of Defendants to his cell phone on August 8, 2018—possibly using (979) 201-5297. This call began with a prerecorded message advertising health insurance, which instructed Plaintiff to press a digit on his phone to proceed. After proceeding to speak with a live representative, Plaintiff was connected to a Health Advisors representative who attempted to sell him insurance. This agent refused to identify his employer, and hung up on Plaintiff after Plaintiff asked for further identifying information.

36.     As another example, Plaintiff received a call from or on behalf of Defendants to

his cell phone on November 26, 2018—again possibly using (979) 201-5297. This call began with a prerecorded message advertising health insurance, which similarly instructed Plaintiff to press a digit on his phone to proceed. After proceeding to speak with a live representative, Plaintiff was connected to a Health Advisors representative who indicated that he was with the "Health and Wellness Enrollment Center"—a fictitious name for Defendant Health Advisors. During this call, Plaintiff was quoted $714.84/month for health insurance through the MultiPlan PPO network, underwritten by Defendant American Financial.

37.     After Plaintiff asked questions about who the company was that called him, he was hung up on. Then, a Health Advisors benefits coordinator named "Patricia" and the agent with whom Plaintiff had been speaking discussed Plaintiff, and called him a "secret shopper." On information and belief, a "secret shopper" refers to call recipients who stay on the line in an attempt to try to find out more about the caller without any interest in purchasing the product or service. Patricia then went on to acknowledge that Health Advisors "ha[d] a lot of secret shoppers on the tap right now"—indicative of the high volume of consumers displeased with Defendants' nonconsensual calls.

38.     As another example, Plaintiff received a call from or on behalf of Defendants to his cell phone on February 13, 2019, from (214) 210-9716. When Plaintiff answered, he heard a prerecorded message advertising health insurance, which instructed Plaintiff to press a digit on his phone to proceed. Plaintiff did so, and was then transferred to a representative, "Lavar," who said he was a licensed insurance agent with "My Life and Health Partners"—which is, on information and belief, a fictitious name for Defendant Supreme Health.

39.     During the February 13, 2019 call, Plaintiff was quoted for an AdvantHealth STM plan through American Financial Security Life Insurance Company, with a monthly rate of

$398.03, starting with a first initial premium of $523.03. Plaintiff was informed during this call that the administering company with the plan was Defendant HII.

40.     After providing requested information to "Lavar" during Defendants' February 13, 2019 call, Plaintiff was transferred to a different representative, who identified herself as "Jasmine" with My Health and Life Partner's (i.e., Supreme Health's) verification department.

41.     Jasmine informed Plaintiff that My Health and Life Partner's customer service number was (954) 530-4268. On information and belief, this is a number for Defendant Supreme Health or one of its affiliates.

42.     After Jasmine verified the name, address, and other information Plaintiff provided, she e-mailed him a link to the application materials attached as Exhibit A, through Defendant HII via its MyBenefitsKeeper platform.

43.     The application materials Plaintiff received consisted of a pre-filled application for an "AdvantHealth STM" plan through American Financial, NCE membership (which, on information and belief, was provided through or in conjunction with NBBI), accidental death and dismemberment coverage through Federal Insurance (for which Med-Sense is listed as the policyholder), and membership in Med-Sense's discount program. Exhibit A.

44.     Jasmine instructed Plaintiff to electronically sign the application materials while she remained on the call with him.

45.     The application Plaintiff received was pre-signed by "Ashley Eastlack" on behalf of the American Financial Life Insurance Company. Exhibit A. When Plaintiff asked who Ms. Eastlack was, Jasmine identified Ashley Eastlack as her manager who worked at her office. When Plaintiff asked to speak with Ms. Eastlack, an individual who identified himself as Billy Vargas came on the line. Mr. Vargas identified himself as a "benefits coordinator," and stated

10

that Ms. Eastlack was the agent of record on the policy.

46.    Mr. Vargas confirmed that the call-back number for My Health and Life Partner was the (954) 530-4268 number for customer service previously provided, and also gave his direct corporate number for My Life and Health Partners as (786) 322-9623. Mr. Vargas then hung up on Plaintiff after Plaintiff noted that he had previously spoken with a person who said she was licensed Florida agent "Melissa Eastlack," even though there was no record of her actually being registered as such, and complained that Defendants had called him repeatedly, wasted his time, and violated the TCPA by making harassing phone calls.

47.    Defendants did not have permission or consent to make the calls to the cell phone numbers of Plaintiff and other members of the class defined below.

48.    Plaintiff has continued to receive phone calls from Defendants, despite that he has asked to be contacted by email, only.

49.    Defendants do not have sufficient Do Not Call polices, or their policies are nonexistent.

50.    For example, NCE does not have an internal Do Not Call policy or procedure at all.

51.    Upon information and belief, Federal Insurance does not typically share Do Not Call information with each of the other Defendants in this lawsuit. Moreover, Federal Insurance's publicly available Do Not Call policy—through its parent company, Chubb—states that its internal Do Not Call policy applies to Nevada residents, only. https://www.chubb.com/us-en/_assets/doc/finalchubbgroup-privacynotice10312016.pdf. This statement is false: The Do Not Call rules and regulations apply to all Americans, not just people living in Nevada.

52.    Defendants' calls to the cell phones of Plaintiff and others were made using an

automatic telephone dialing system ("autodialer") under the TCPA. The equipment had the capacity to store or produce telephone numbers to be called using a random or sequential number generator, and to dial such numbers.  In other words, no human being physically dialed each digit of Plaintiff's and the other class members' telephone numbers to call their phones—the calls were made using equipment with the capacity to dial a large number of phone numbers in a short period of time, without human intervention.

53.     The equipment used to call Plaintiff and the other class members sequentially or randomly accessed their stored telephone numbers, and automatically called them.   The autodialer accessed a dataset provided by Defendants or their vendor, sorted through that dataset to determine which data to use to generate a list of numbers to call, generated a brand-new sequence for calling those numbers based upon complex algorithms, and then called the numbers. The dialer randomly and sequentially generated phone numbers for calling from a dataset, and then automatically called those numbers.

54.     The equipment Defendants' used to contact the class members constituted an "automatic telephone dialing system."

55.     Defendants' business model is to knowingly use an autodialer and/or artificial or prerecorded voices to call cellular telephones they know they do not have consent to call.

56.     On information and belief, Defendants keeps records and data from which it can determine which autodialed calls it made without consent, but have elected not to engage such to prevent TCPA violations for unfathomable business reasons.

57.     Plaintiff and the class have been damaged by Defendants' calls. Their privacy was improperly invaded, Defendants' calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls.

Defendants' calls were annoying and a nuisance, and wasted the time of Plaintiff and the class. *See, e.g., Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200, 1211 (11th Cir. 2018) ("[T]ime wasting is an injury in fact" …. "[A] small injury… is enough for standing purposes"); *Mims* 132 S. Ct. at 740 (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

58.     Plaintiff suffered an injury-in-fact in at least one of the manners contemplated by Congress when it passed the TCPA because of Defendants' conduct.

59.     Plaintiff's injury-in-fact is fairly traceable to the challenged representations and conduct of Defendants. It was the calls themselves that invaded Plaintiff's privacy.

60.     Plaintiff and the class's injury-in-fact is likely to be redressed by a favorable decision in this Court in the form of money damages, and/or in the form of an injunction against future calls. An injunction is appropriate and necessary.

**Defendants' Liability**

61.     Defendants are directly liable for their own participation and involvement in making and facilitating the calls at issue. 47 U.S.C. § 227(b)(1)(A)(iii) (prohibiting the "making" of such calls); *Maryland v. Universal Elections, Inc.*, 729 F.3d 370, 378 (4th Cir. 2013).

62.     Additionally, the Federal Communication Commission has instructed that sellers such as the Insurance Companies, HII, Med-Sense, NBBI, and NCE may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law

enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re Joint Petition Filed by DISH Network, LLC et al. for Declaratory Ruling Concerning the TCPA Rules*, 28 FCC Rcd. 6574, at ¶ 37 (2013) ("*FCC 2013 Ruling*") (citations omitted).

63.     Health Advisors and its principals Michael Smith and Zachary Cox, and Supreme Health and its principal Blake Fishman, made the autodialed and prerecorded message calls described herein "on behalf of" the Insurance Companies, HII, Med-Sense, NBBI, and NCE within the meaning of the FCC's Declaratory Rulings and 47 U.S.C. § 227(c)(5). Alternatively, the calls at issue were made "on behalf of" Health Advisors, Smith, Cox, Supreme Health, and Fishman, by other lead generators, in which case Health Advisors, Smith, Cox, Supreme Health, and Fishman are subject to vicarious liability, as well, including as a result of their own direct, knowing participation in the calling and illegal lead generation scheme at issue.

64.     The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *See In re Rules & Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, at ¶ 13 (1995).

65.     The FCC has "repeatedly acknowledged the existence of vicarious liability under the TCPA." *See Gomez v. Campbell-Ewald Co.*, 768 F. at 878 (citing *In re Joint Petition Filed by Dish Network, LCC*, 28 FCC. Rcd. 6574, 6574 (2013)). Principles of apparent authority and ratification may also provide a basis for vicarious seller liability for violations of section 227(b). *See Thomas v. Taco Bell Corp.*, 582 Fed. Appx. 678 (citing 28 FCC Rcd. at 6590 n. 124).

66.     More specifically, the *FCC 2013 Ruling* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is

liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. 28 FCC Rcd. at ¶ 34.

67. The FCC has rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at n. 107.

68. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

28 FCC Rcd. at ¶ 46.

69. Defendants are directly liable for the telemarketing calls at issue because they, among other things:

a. in at least the case of Health Advisors and Supreme Insurance, actively participated in those calls;

b. knowingly paid for the leads or to receive applications for insurance/their products and services resulting from such calls; and

c. issued quotations for insurance or acquired memberships wholly derived from such calls.

15

70.     Defendants knowingly and actively accepted business that originated through the illegal telemarketing calls at issue.

71.     Moreover, Defendants maintain control over their lead generators' actions in telemarketing and generating leads on their behalf.

72.     At all times relevant, Defendants had control over whether, and under what circumstances, they issued an insurance quote or membership in their non-insurance discount products to a prospective customer.

73.     At all times relevant, Defendants had control over what sort of lead generation they would accept business from. Defendants chose to accept and monetize marketing leads that were generated through outbound autodialed and prerecorded message calls to cell phones.

74.     Defendants were each aware of the nature of the telemarketing campaign through which Plaintiff and the class were called—including that automated calls were being made to consumers without prior express consent—but they continued to engage such services.

75.     The Insurance Companies issued insurance policies to persons who accepted quotations or applied for insurance as a result of these calls.

76.     On information and belief, the persons and entities that placed the calls at issue did so with Defendants' actual authority.

77.     Defendants knew (or reasonably should have known) that their lead generators were violating the TCPA on their behalf, and failed to take effective steps within its power to force the telemarketer to cease that conduct.

78.     The May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such

information." *Id.* at¶ 46.  Moreover, evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at ¶ 46.

79.     Defendants cloaked their lead generators with apparent authority to place the calls at issue on their behalf—including through the permitted use of their tradenames during such calls and even executing the application on behalf of Defendants (for example, in the case of Supreme Health's Ashley Eastlack signing on behalf of American Financial, <u>Exhibit A</u>).

80.     On information and belief, Defendants' lead generators have the "ability . . . to enter consumer information into the seller's sales or customer systems," as discussed in the *FCC 2013 Ruling*, further evidencing their apparent authority for such calling.

81.     By knowingly retaining and paying their telemarketing lead generators for leads generated through the illegal calling alleged herein, Defendants ratified the illegal calling at issue.

<h3 style="text-align:center">Class Action Allegations</h3>

82.     Plaintiff brings this action on behalf of a class consisting of:

(a) All persons in the United States whose cellular telephone number (b) Defendants or someone on their behalf called using (1) an unattended message or (2) the same dialing system used to call Plaintiff and/or an unattended message, (c) where Defendants do not have an executed written agreement from the recipient of the calls, that specifies that Defendants may use prerecorded messages to call their cell phones.

83.     Defendants caused more than 40 unique cellular telephone numbers to be called using an unattended message or the same dialer used to call Plaintiff, where the recipient never provided their phone number to Defendants to be called.

84.     Common questions of law or fact exist as to all members of the class, which

predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common to the class include but are not limited to:

     a. Whether the calls to Plaintiff and the class were made using an "automatic telephone dialing system" as such term is defined or understood under the TCPA and applicable FCC regulations and orders;

     b. Whether the calls to Plaintiff and the class were made using a "artificial or prerecorded voice" as such terms are defined or understood under the TCPA and applicable FCC regulations and orders

     c. Whether Defendants had prior express consent to call the cell phone numbers of Plaintiff and the other members of the class; and

     d. Damages, including whether any violations were performed willfully or knowingly such that Plaintiff and the other members of the class are entitled to treble damages under 47 U.S.C. § 227(b)(3).

85. Plaintiff's claims are typical of the claims of the other members of the class. The factual and legal bases of Defendants' liability to Plaintiff and the other members of the class are the same: Defendants violated the TCPA by causing automated, nonconsensual calls to be made to the cellular telephone number of each member of the class.

86. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing his claims vigorously, and he has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

87. Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would entail. There are, on information and belief, thousands of class members, such that joinder of all members is impracticable.

88.     No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

89.     Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the class, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual members of the class, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

90.     The identity of the class is, on information and belief, readily identifiable from Defendants' records.

## COUNT I
### Violations of the TCPA, 47 U.S.C. § 227 (Artificial/Prerecorded Voice Calls)

91.     Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

92.     It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . .." 47 U.S.C. § 227(b)(1)(A)(iii).

93.     Defendants initiated or caused to be initiated calls to the cellular telephone

numbers of Plaintiff and the other members of the class defined above using an artificial or prerecorded voice.

94.    These calls were made without regard to whether or not Defendants had previously obtained express consent or permission from Plaintiff or other members of the class to make such calls. In fact, Defendants did not have prior express consent to call the cell phones of the cell phones of Plaintiff and the other members of the class when the calls were made when the calls were made.

95.    Defendants' prerecorded calls did not specify the caller, or conform to the notice requirements of the TCPA, including for example as delineated in 47 C.F.R. § 64.1200(b). In fact, the prerecorded calls generally misled call recipients as to the nature of the caller.

96.    And while some (but not all) of Defendants' prerecorded calls included opt-out mechanisms, those mechanisms were not used or honored.

97.    Defendants' calls and violations were negligent. Alternatively, they were willful or knowing.

98.    Defendants violated the TCPA by making non-emergency calls to the cell phones of Plaintiff and others using an artificial or prerecorded voice, without prior express consent.

99.    On information and belief, some of the calls to Plaintiff and the class were made by vendors of Defendants. Defendants are liable for those calls, too.

100.    As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and other members of the class were harmed and are each entitled to a minimum of $500 in damages for each violation. Plaintiff and class are also entitled to an injunction against future calls.  47 U.S.C. § 227(b)(3).

101.    Because Defendants knew or should have known that Plaintiff and the other

members of the class had not given prior express consent to receive its calls using an artificial or prerecorded voice to the cell phones of Plaintiff and others—and/or willfully caused calls to be made to the cell phones of Plaintiff and the other members of the class without prior express consent—the Court should treble the amount of statutory damages available to Plaintiff, pursuant to Section 227(b)(3) of the TCPA.

## COUNT II
### Violations of the TCPA, 47 U.S.C. § 227 (ATDS Calls)

102.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

103.    It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular telephone service . . .." 47 U.S.C. § 227(b)(1)(A)(iii).

104.    Defendants initiated or caused to be initiated calls to the cellular telephone numbers of Plaintiff and the other members of the class defined above using an automatic telephone dialing system.

105.    These calls were made without regard to whether or not Defendants had previously obtained express consent or permission from the called party to make such calls. In fact, Defendants did not have prior express consent to call the cell phones of Plaintiff and the other members of the class when the calls were made.

106.    Defendants' calls and violations were negligent. Alternatively, they were willful or knowing.

107.    Defendants violated the TCPA by making non-emergency calls to the cell phones of Plaintiff and others using an automatic telephone dialing system without prior express

consent.

108.    On information and belief, some of the calls to Plaintiff and the class were made by vendors of Defendants. Defendants are liable for those calls, too.

109.    As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and the other members of the class were harmed and are each entitled to a minimum of $500 in damages for each violation. Plaintiff and the class are also entitled to an injunction against future calls.  47 U.S.C. § 227(b)(3).

110.    Because Defendants knew or should have known that Plaintiff and the other members of the class had not given prior express consent to receive its automated calls to their cell phones—and/or willfully caused automated calls to be made to the cell phones of Plaintiff and the other members of the class without prior express consent—the Court should treble the amount of statutory damages available to Plaintiff and the other members of the class, pursuant to Section 227(b)(3) of the TCPA.

## COUNT III
**Violations of the TCPA, 47 U.S.C. § 227 (Internal DNC)**

111.    Plaintiff re-alleges and incorporates the foregoing allegations as if fully set forth herein.

112.    The TCPA requires any party that is engaged in telemarketing – including "sellers" who do not make calls themselves – to maintain and honor a written internal do-not-call policy.

113.    Defendants violated the TCPA by not having sufficient internal DNC policies and/or by not following or honoring the policies that they did have.

114.    As a result of these violations, Plaintiff and the class were damaged by Defendants' violations, in that they received non-privileged and unsolicited telemarketing calls

that invaded their privacy.

WHEREFORE, Plaintiff Robert Hossfeld, individually and on behalf of the class, respectfully requests that the Court enter judgment against Defendants for:

A.    Certification of the class as alleged herein;

B.    A declaration that Defendants violated the TCPA as to Plaintiff and the class;

C.    Injunctive relief aimed at ensuring the prevention of Defendants from violating the TCPA in the future;

D.    Damages pursuant to 47 U.S.C. § 227(b)(3) and 47 U.S.C. § 227(c)(5), as applicable;

E.    Costs, expenses, and attorneys' fees, to the extent permitted by law; and

F.    Such other or further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully submitted,

ROBERT HOSSFELD, individually and on behalf of others similarly situated

Dated: March 6, 2019           By:    *s/* Scott D. Owens
                                       Scott D. Owens (Fla. Bar No. 597651)
                                       SCOTT D. OWENS, P.A.
                                       3800 S. Ocean Dr., Suite 235
                                       Hollywood, FL 33019
                                       Telephone: (954) 589-0588
                                       scott@scottdowens.com

                                       Alexander H. Burke*
                                       BURKE LAW OFFICES, LLC
                                       155 N. Michigan Ave., Suite 9020
                                       Chicago, IL 60601
                                       Telephone: (312) 729-5288
                                       aburke@burkelawllc.com

                                       *Counsel for Plaintiff*
                                       *pending admission *pro hac vice*

23