**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**Case No. 00:19-cv-60597-DPG**

ROBERT HOSSFELD, individually
and on behalf of others similarly situated,
   *Plaintiff*,
  v.

AMERICAN FINANCIAL
SECURITY LIFE INSURANCE
COMPANY, FEDERAL INSURANCE
COMPANY, HEALTH INSURANCE
INNOVATIONS, INC. n/k/a BENEFYTT
TECHNOLOGIES, INC., MED-SENSE
GUARANTEED ASSOCIATION,
NATIONAL CONGRESS OF
EMPLOYERS, INC., NATIONAL
BENEFIT BUILDERS, INC.,
RX HELPLINE LLC, and
TELADOC HEALTH, INC.,
   *Defendants*.
_____/

      **CLASS ACTION**
      **JURY TRIAL DEMANDED**

## SECOND AMENDED CLASS ACTION COMPLAINT

1. Plaintiff Robert Hossfeld brings this action, on behalf of himself and others, to secure redress against Defendants for violations of the Telephone Consumer Protection Act's ("TCPA") automated-call prohibition and internal do-not-call rules.

2. Plaintiff has received several nonconsensual, automated telemarketing calls to his cell phone since the date four years prior to the filing of this action, made for the purpose of encouraging the sale of the products and services of Defendants American Financial Security Life Insurance Company ("American Financial"), Federal Insurance Company ("Federal Insurance"), Med-Sense Guaranteed Association ("Med-Sense"), National Congress of Employers, Inc. ("NCE"), National Benefit Builders, Inc. ("NBBI"), Rx Helpline LLC ("Rx Helpline"), and Teladoc Health, Inc. ("Teladoc") (collectively, "Seller Defendants").

3.      These calls, and similar calls to other consumers, were facilitated through Defendant Health Insurance Innovations, Inc. n/k/a Benefytt Technologies, Inc. ("HII"), a publicly-traded company that operates as an intermediary between its network of insurance agent and marketer lead generators on the one hand, and insurance and health-related companies—including Seller Defendants—on the other.

4.      As detailed below, Defendants – and each of them – are liable for these calls, even though they did physically initiate them. The Seller Defendants each contracted for HII to provide its telemarketing-based lead generation services, and provided actual or, at the very least, apparent authority for the calling at issue, including by authorizing use of their tradenames during and in relation to the calls, approving and providing call scripts, issuing or providing quotes, managing or providing the purchased products and services, and collecting profits derived therefrom.

5.      HII actively participates in the calling, including by pairing its lead generators with the quotes it wants them to provide the consumer in real-time, and emailing the quote and application materials to the call recipient directly while he or she is still on the line. Each Defendant willingly participated in this scheme despite knowing that HII's lead generators were generating the leads through nonconsensual, automated telemarketing to consumers' cell phones and with inadequate internal Do Not Call procedures, and ratified it by retaining the calls' financial and non-monetary benefits, even in the face of multiple lawsuits against HII and other Defendants for these exact same violations.

## INTRODUCTION

6.      Advancements in telephone dialing technology by the 1980s and 90s made reaching a large number of consumers by telephone easier and more cost-effective. However,

this technology also brought with it an onslaught of unsolicited robocalls, spam text messages, and junk faxes that intrude on individual privacy and waste consumer time and money. As a result, the federal government and numerous states have enacted legislation to combat these widespread telemarketing abuses.  As Congress recognized:

> Many customers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers…. Banning such automated or prerecorded telephone calls … except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion.

Pub. L. No. 102-243, 105 Stat. 2394 § 2(6, 12) (1991).

7.      As is relevant here, the TCPA prohibits using an autodialer and/or a prerecorded voice to call cellular telephones for telemarketing purposes, without proper consent, 47 U.S.C. § 227(b)(1)(A)(iii). The TCPA also prohibits telemarketing to people who have asked not to receive calls. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259 (11th Cir. 2019).

8.      The TCPA provides liability for those who did not physically initiate calls, pursuant to principles of agency, including actual authority, apparent authority and ratification.

9.      Under theories of actual authority, apparent authority, and ratification (and, in HII's case, direct liability), Defendants are each liable under the TCPA for the nonconsensual, automated telemarketing calls their third-party telemarketers made to Plaintiff and the other class members, and their failure to adhere to the TCPA's do-not-call rules.

## JURISDICTION AND VENUE

10.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, because this case arises under federal law. *Mims v. Arrow Financial Services, Inc.*, 132 S. Ct. 740 (2012).

11.     Jurisdiction is also proper under 28 U.S.C. § 1332(d)(2) because Plaintiff alleges a national class, which will result in at least one class member belonging to a different state than

that of Defendant. Plaintiff seeks up to $1,500.00 (one-thousand-five-hundred dollars) in damages for each violation of the TCPA, which, when aggregated among a proposed class numbering in the tens of thousands, or more, exceeds the $5,000,000.00 (five-million dollars) threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA"). Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

12.    The Court has personal jurisdiction over each Defendant because the specific telemarketing at issue in this case has the following material and substantial ties to Florida:

    a.  HII – engaged by each Seller Defendant to market that Seller Defendant's goods and services – is headquartered in Florida;

    b.  The Celerity Telecom Power Dialer HII's lead generator Health Advisors' subvendor used to call Hossfeld and others in the class was based in Hollywood, Florida;

    c.  The vendor Health Advisors used to internally transfer and record Hossfeld's and some or all class members' calls, Fextel, is headquartered in Florida;

    d.  The insurance agents that were responsible for the telemarketing to Hossfeld were located in Fort Lauderdale, Florida when they tried to sell Hossfeld and others the Seller Defendants' products and services; and

    e.  American Financial is headquartered in this District.

13.    Venue is proper because the calls at issue in the case originated from this District.

**PARTIES**

14.    Plaintiff Robert Hossfeld is a natural person and a citizen of the State of Texas. At all relevant times, Plaintiff was the subscriber and sole user of his cellular telephone at which he received calls, as well as the subscriber of his minor son's cell phone at which Plaintiff also

received calls applicable to this case. All calls to Plaintiff's cell phone numbers occurred while Plaintiff was in the State of Texas.

15.     Defendant HII is a Delaware corporation headquartered at 15438 North Florida Avenue, Suite 201, Tampa, Florida 33613. On March 6, 2020, HII changed its name from "Health Insurance Innovations, Inc." to "Benefytt Technologies, Inc." Among other things, HII has a MyBenefitsKeeper product it promotes as a "one-stop-shop" for consumers to manage benefits and purchase its customers' products—including through the telemarketing at issue.

16.     Defendant American Financial Security Life Insurance Company ("American Financial") is a Missouri corporation headquartered at 55 NE 5th Avenue, Suite 502, Boca Raton, Florida 33432. American Financial hired Florida-based HII to market its products and services via the telemarketing at issue, which was performed through a Florida-based autodialer company, using Florida-based telemarketers and Florida-based insurance agents. American Financial also directly engaged the insurance agents that made the sales pitches to Plaintiff and the class.

17.     Defendant Federal Insurance Company ("Federal Insurance") is an Indiana corporation headquartered at 251 North Illinois Street, Suite 1100, Indianapolis, Indiana 46204. Federal Insurance hired Florida-based HII to market its products and services via the telemarketing at issue. Federal Insurance hired Florida-based HII to market its products and services via the telemarketing at issue, which was performed through a Florida-based autodialer company, using Florida-based telemarketers and Florida-based insurance agents. Federal Insurance also directly engaged the insurance agents that made the sales pitches to Plaintiff and the class.

18.     Defendant Med-Sense Guaranteed Association, Inc. ("Med-Sense") is a Delaware

corporation headquartered at 16476 Wild Horse Creek Road, Chesterfield, Missouri 63017. Med-Sense maintains a registered agent in Florida at CT Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324. Med-Sense hired Florida-based HII to market its products and services via the telemarketing at issue, which was performed through a Florida-based autodialer company, using Florida-based telemarketers and Florida-based insurance agents.

19.     Defendant National Congress of Employers, Inc. ("NCE") is a Delaware corporation headquartered, on information and belief, at 100 Garden City Plaza, Suite 102, Garden City, New York 11530. NCE hired Florida-based HII to market its products and services via the telemarketing at issue, which was performed through a Florida-based autodialer company, using Florida-based telemarketers and Florida-based insurance agents.

20.     Defendant National Benefit Builders, Inc. ("NBBI") is a New Jersey corporation headquartered at 25 Hanover Road, Florham Park, New Jersey 07932. NBBI has a relationship with NCE to market NCE-branded health or insurance-related discount products and, on information and belief, coordinated the marketing of NCE memberships to Plaintiff and other class members.

21.     Defendant Rx Helpline LLC ("Rx Helpline") is a Florida limited liability company with a principal place of business at 7551 Wiles Road, Suite 106, Coral Springs, Florida 33067. Rx Helpline is, on information, a prescription savings program that attempts to provide low-cost alternatives for prescription medications. Rx Helpline hired Florida-based HII to market its products and services via the telemarketing at issue, which was performed through a Florida-based autodialer company, using Florida-based telemarketers and Florida-based insurance agents.

22.     Defendant Teladoc Health, Inc. ("Teladoc") is a Delaware corporation

headquartered at 2 Manhattanville Road, Suite 203, Purchase, New York 10577. Teladoc is a provider of remote medical care services. Teladoc hired Florida-based HII to market its products and services via the telemarketing at issue, which was performed through a Florida-based autodialer company, using Florida-based telemarketers and Florida-based insurance agents.

## HII's Telemarketing Scheme

23.     Defendant HII controls a network of third-party telemarketers and insurance agent lead generators with whom it contracts to generate business for Seller Defendants and similar companies.

24.     In its own words, HII "assist[s] in the development of insurance products through [its] relationships with … insurance companies" and provide[s] access to these products through a broad distribution network of third party licensed insurance agents across the nation, [its] call center network and [its] unique online capabilities." https://www.hiiq.com/about (last viewed Apr. 13, 2020).

25.     HII's telemarketing scheme works like this: Seller Defendants and others contract with HII to generate business through its lead generation platform and network of telemarketers and insurance agents.

26.     HII, in coordination with Seller Defendants, bundles healthcare products and services into packages to promote to consumers. The marketing companies and insurance agencies with whom HII, in turn, contracts for that purpose then telemarket to potential customers like Plaintiff, in order to sell Seller Defendants' products and services through HII.

27.     HII engages licensed insurance agents such as Michael Smith, Zachary Cox and Sean Duffie, among others, to perform telemarketing on HII and the Seller Defendants' behalf. Exhibit A is form contract drafted by HII, and is an example of a contract setting forth some

aspects of the written relationship between HII and insurance agents that made the calls at issue in this case.

28.     By law, Smith, Cox, Duffie and the other agents that work with HII to sell health insurance also have direct relationships with the insurance companies whose products and services they sell during the telemarketing at issue in this case.

29.     HII provides scripts approved by each respective Seller Defendant to its insurance agents such as Cox, Duffie and Smith to use during the calls. Exhibits B and C are exemplars of such scripts.

30.     Seller Defendants – as explained below in more detail – each authorized HII to have telemarketers use its name during the telemarketing and lead generation at issue, and authorized HII to have telemarketers use its pricing and product descriptions and to ultimately sell the Seller Defendant's products and services on telemarketing calls, like what happened to Plaintiff.

31.     HII quotes Seller Defendants' insurance and health-related products and services using proprietary pricing and product information provided to it by Seller Defendants in order to generate a quote to pass on call recipients in real time.

32.     HII then emails the consumer an application for Seller Defendants' products and services such as it did with Plaintiff in Exhibits D-G, to fill out during the phone calls at issue.

33.     If a consumer executes the telemarketing-generated application and is accepted by the applicable Seller Defendant, then HII proceeds to administer the insurance and other health care related products and services that it sold through the telemarketing.

34.     Each Seller Defendant is aware that HII's lead generators and agents engage in unsolicited, prerecorded telemarketing on its behalf, but it nonetheless continues to use HII to

generate business. Indeed, Seller Defendants actively encourage these calls by providing and approving marketing scripts to be used during them, providing proprietary pricing and product information to be used during the sales calls, granting HII and its telemarketers and insurance agents permission to use its tradename, and coordinating with HII in the management of billing of the consumer for its respective products and services on an ongoing basis.

35.     Neither any Seller Defendant nor HII has and/or adheres to a valid internal Do Not Call Policy, and these companies do not take adequate steps to ensure that the entities making calls to sell their products and services have and adhere to any internal Do Not Call policy, either. *See, e.g. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Request of State Farm for Clarification and Declaratory Ruling*, 20 FCC Rcd. 13664, 13666-13668 (FCC 2005).

36.     Defendants' telemarketing is prolific. For example, Plaintiff's counsel possess 6,130,172 direct-inbound-dial ("DID") records of call transfers HII lead generator Health Advisors received as a result of its vendor, Rising Eagle, calling 3,415,063 unique consumer phone numbers using its Celerity-brand "MyDialer" autodialer. These include records of fourteen calls with Plaintiff Hossfeld's cell phone number and that of his minor son, for which he is the subscriber. Rising Eagle made all of these calls without a written do-not-call policy.

37.     Plaintiff and the other class members have been damaged by the calls made on Defendants' behalf. Their privacy was improperly invaded, the calls temporarily seized and trespassed upon the use of their phones, and they were forced to divert attention away from other activities to address the calls.  The calls were annoying and a nuisance, and wasted the time of Plaintiff and the other class members. *See, e.g., Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200, 1211 (11th Cir. 2018) ("[T]ime wasting is an injury in fact".... "[A] small injury…

is enough for standing purposes"); *Mims* 132 S. Ct. at 740 (discussing congressional findings of consumer "outrage" as to autodialed and prerecorded calls).

**The Calls Plaintiff Received**

38.     <u>August 8, 2018 Call</u>. Plaintiff received a call to his cell phone on August 8, 2018, which came from caller ID (979) 201-5297. This call was made at the request of HII and the Seller Defendants for the purpose of selling HII and the Seller Defendants' products and services.

39.     The call began with a prerecorded message advertising health insurance, which instructed Plaintiff to press a digit on his phone to proceed.

40.     Plaintiff pressed a digit, and was connected to a Health Advisors of America, Inc. ("Health Advisors") representative who attempted to sell him insurance. Health Advisors is a company loosely created in order to assist Smith, Cox, Duffie and others with their duties in telemarketing for HII and the Seller Defendants.

41.     This agent refused to identify his employer, and hung up on Plaintiff after Plaintiff asked for further identifying information.

42.     This call was made for the purpose of encouraging the purchase of one or more of Seller Defendants' goods, products, or services through HII.

43.     <u>November 26, 2018 Call</u>. Plaintiff received a call to his cell phone on November 26, 2018, using caller ID (979) 201-5297.

44.     HII paid for all or part of this telemarketing call.

45.     This call began with a prerecorded message advertising health insurance, which instructed Plaintiff to press a digit on his phone to proceed. After proceeding to speak with a live representative, Plaintiff was connected to a Health Advisors representative who indicated that he

was with the "Health and Wellness Enrollment Center."

46.     During this call, Plaintiff was quoted $714.84/month for health insurance through the MultiPlan PPO network, underwritten by Defendant American Financial.

47.     HII provided this quote using proprietary pricing information American Financial provided to HII for purposes of selling its insurance policies during telemarketing calls.

48.     The American Financial policy was to be administered by HII.

49.     After Plaintiff asked questions about who the company was that called him, the person on the other end of the line apparently believed she had hung up on Plaintiff.

50.     It is Defendants' practice and policy to have telemarketers hang up on consumers who ask too many questions.

51.     Then, without having truly hung up on Plaintiff, a Health Advisors benefits coordinator named "Patricia" and the agent with whom Plaintiff had been speaking discussed Plaintiff, and called him a "secret shopper." "Secret shopper" refers to HII's practice of monitoring its agents' telemarketing practices by calling in and pretending to be interested in products or services.

52.     This call was made for the purpose of encouraging the purchase of goods, products, or services of American Financial through HII.

53.     <u>February 13, 2019 Call</u>. Plaintiff received a call to his cell phone on February 13, 2019, from (214) 210-9716.

54.     HII paid for all or part of this telemarketing call.

55.     When Plaintiff answered, a prerecorded message was played that advertised health insurance, which instructed Plaintiff to press a digit on his phone to proceed.

56.     Plaintiff pressed a digit, and was then transferred to a representative, "Lavar,"

who said he was a licensed insurance agent with "My Life and Health Partners"—which is a fictitious name for Health Advisors.

57.     During this call, Lavar used HII's web platform to develop a quote for insurance and other health care related products and services.

58.     Using HII's web quoting platform, the telemarketer quoted Plaintiff an AdvantHealth STM (short-term medical) plan, underwritten by Defendant American Financial, with a monthly rate of $398.03, starting with a first initial premium of $523.03.

59.     Plaintiff was informed during this call that the administering company with the plan was Defendant HII. Upon information and belief, that statement was true: HII was to be the administering company for the American Financial health insurance policy that was being sold during this call.

60.     Plaintiff was then transferred to a different representative, who identified herself as "Jasmine" with My Health and Life Partner's (i.e., Health Advisors) verification department.

61.     Jasmine informed Plaintiff that My Health and Life Partner's customer service number was (954) 530-4268. On information and belief, this is a number for Health Advisors or one of its affiliates, located in Fort Lauderdale, Florida.

62.     Using HII's web-quoting system – the same system used to generate the quote mentioned during the call, HII emailed Plaintiff a link to the application materials attached as Exhibit D.

63.     These application materials were part-in-parcel with the telemarketing call. The call was placed for the purpose of selling those products and services.

64.     Plaintiff received consisted of a pre-filled application for an "AdvantHealth STM" plan through American Financial, NCE membership which was provided through or in

12

conjunction with NBBI, accidental death and dismemberment coverage through Federal Insurance (for which Med-Sense is listed as the policyholder), membership in Med-Sense's discount program, Teladoc's "27/7 doctor visits by telephone" service, and Rx Helpline. Exhibit D.

65.     Plaintiff believed the representations during the call about on whose behalf the call was made, and continued to engage with the caller relying upon such. Plaintiff's belief that the call was made to sell these products and services was both reasonable, and correct: The February 13, 2019 call was in fact made on behalf of Defendants HII, American Financial, Federal Insurance, Med-Sense, NCE, NBBI, Teladoc, and Rx Helpline.

66.     Jasmine instructed Plaintiff to electronically sign the application materials while she remained on the call with him.

67.     The application Plaintiff received was pre-signed by "Ashley Eastlack" on behalf of Defendant American Financial. Exhibit D. When Plaintiff asked who Ms. Eastlack was, Jasmine identified Ashley Eastlack as her manager who worked at her office. When Plaintiff asked to speak with Ms. Eastlack, an individual who identified himself as Billy Vargas came on the line. Mr. Vargas identified himself as a "benefits coordinator," and stated that Ms. Eastlack was the agent of record on the policy.

68.     Mr. Vargas confirmed that the call-back number for My Health and Life Partner was the (954) 530-4268 number for customer service previously provided, and also gave his direct corporate number for My Life and Health Partners as (786) 322-9623.

69.     Mr. Vargas then hung up on Plaintiff after Plaintiff noted that he had previously spoken with a person who said she was licensed Florida agent "Melissa Eastlack," even though there was no record of her actually being registered as such, and complained that Defendants had

called him repeatedly, wasted his time, and violated the TCPA by making harassing phone calls.

70.     <u>March 5, 2019 Call</u>. On March 5, 2019, Plaintiff received a missed call on his cell phone from, on information and belief, (512) 870-1914.

71.     HII paid for all or part of this call.

72.     Plaintiff called the number back, and indicated that he was Michael Johnson.

73.     During this call, HII quoted Plaintiff $278.94/month plus a $125 enrollment fee for an AdvantHealth plan with medical, dental, and vision coverage underwritten by American Financial, through NCE as the association providing access to the coverage, utilizing the Multiplan PPO network.

74.     The representative during this March 5, 2019 call, "Mitch," provided Plaintiff with his direct number of (877) 444-5188, extension 1139.

75.     Mitch then transferred Plaintiff to "Bridgette" with the "verification department," who went over Plaintiff's information and the plan Plaintiff had been offered before the call was disconnected.

76.     This call was made for the purpose of encouraging the purchase of goods, products, or services of American Financial, NCE and its partner NBBI, and likely others, through HII.

77.     <u>March 6, 2019: Case Filed</u>. Plaintiff filed this action on March 6, 2019. Defendants were served in March and April, 2019.

78.     <u>May 22, 2019 Call</u>. Despite that Plaintiff had already filed this lawsuit, Plaintiff received another similar, unsolicited, insurance telemarketing call on his minor son's cell phone for which Plaintiff is the subscriber on May 22, 2019.

79.     The representative identified himself as "Billy Smith"—with a call-back number

of (855) 410-5244—and he began the call saying that he had "major medical health" products available.

80.    Plaintiff indicated that he was interested in an individual plan, and identified himself as "Jason Miller." Billy told Plaintiff that he had found a "major medical" policy that was less than $300/month. Billy explained that, for example, the plan provided $1,000,000 in coverage, unlimited doctor visits, etc. Billy then asked Plaintiff if he wanted dental or vision, and explained that this would be "full coverage dental."

81.    Billy read this information from an AdvantHealth script, provided to him by HII.

82.    Billy explained that the plan he was offering to Plaintiff was through AdvantHealth, on the MultiPlan PPO network.

83.    Ultimately, Billy transferred Plaintiff to a "verification officer," who proceeded to ask him further questions.

84.    While Plaintiff was still on the call, and in coordination with its lead generator, HII emailed Plaintiff a link to the application materials attached as Exhibit E, through its MyBenefitsKeeper platform.

85.    The application materials Plaintiff received consisted of a pre-filled application for an "AdvantHealth STM" NCE-group plan through American Financial, NCE membership (which, on information and belief, was provided through or in conjunction with NBBI), accidental death and dismemberment coverage, telephonic doctor services through Teladoc, a VibraSmile dental plan underwritten by Axis Insurance, and membership in the AFEUSA, ScripPal, PEP, and Rx Helpline discount programs. Exhibit E.

86.    The application Plaintiff received was pre-signed by "Ann Fils" on behalf of Defendant American Financial. Exhibit E.

15

87.     Upon information and belief, the Accidental Death and Dismemberment coverage offered to Plaintiff during this May 22, 2019, call was offered by Defendant Federal Insurance.

88.     Plaintiff also spoke with another representative on May 22, 2019, "Lisa," who indicated that the insurance came through Defendant HII.

89.     Plaintiff complained about the number of calls he was receiving, at which point "Lisa" transferred Plaintiff to her supervisor, "William."

90.     Plaintiff explained to William that he never submitted anything online or opted-in to be contacted at all, and told Defendants' representative to never call his phone again.

91.     Plaintiff believed the representations during the call about on whose behalf the call was made, and continued to engage with the caller relying upon such. Plaintiff's belief that the call was made to sell these products and services was both reasonable, and correct: The May 22, 2019 call was in fact made on behalf of Defendants HII, American Financial, Federal Insurance, NCE, NBBI, Teladoc, and the other identified sellers.

92.     August 14, 2019 Call. Despite that Plaintiff had already filed this lawsuit, Plaintiff received another unsolicited, insurance telemarketing call to his cell phone number on August 14, 2019, from caller ID (254) 613-1105.

93.     HII paid for part or all of this call.

94.     Plaintiff called the number back a minute later, and was connected to a live representative after an initial prerecorded prompt promoting "affordable health insurance."

95.     The representative—who later identified himself as "Ryan" with "Global Health" (another HII lead generator)—confirmed that Plaintiff had been called to see if he was in the market for health insurance. Plaintiff indicated that he was interested in an individual plan, answered a few basic health questions, and provided a ZIP code and birth date. Ryan told

Plaintiff that he had found a "major medical" MultiPlan PPO policy for a $248.83 monthly premium, which also included $75,000 in accidental death benefits, a prescription discount card, and Teladoc benefits.

96.     Ryan followed a script provided by HII.

97.     While Plaintiff was still on the call, and in coordination with its lead generator, HII emailed Plaintiff a link to the application materials attached as <u>Exhibit F</u>, through its MyBenefitsKeeper platform.

98.     The application materials Plaintiff received consisted of a pre-filled application for a "Select STM" plan through Standard Life and Accident Insurance Company, accidental death and dismemberment coverage through Federal Insurance, Med-Sense membership, telephonic doctor services through Teladoc, and membership in a health education program and the Rx Helpline discount program. <u>Exhibit F</u>. The application materials also included terms and conditions indicating that billing would be handled via HII's MyBenefitsKeeper platform. *Id.*

99.     Plaintiff told Ryan that he did not want to be contacted by phone, who confirmed that he "indicated on there" that Plaintiff did not want to be contacted by phone.

100.    Plaintiff attempted to complete the transaction with Ryan through HII's MyBenefitsKeeper platform, but the payment didn't go through.

101.    Plaintiff again confirmed at the end of the call that he didn't want to be contacted on his cell phone number ever again.

102.    Plaintiff believed the representations during the call about on whose behalf the call was made, and continued to engage with the caller relying upon such. Plaintiff's belief that the call was made to sell these products and services was both reasonable, and correct: The August 14, 2019 call was in fact made on behalf of Defendants HII, Federal Insurance, and Med-

Sense, as well as Teladoc and Rx Helpline.

103.    <u>August 29, 2019 Call</u>. Despite that Plaintiff had already filed this lawsuit, Plaintiff received another unsolicited, insurance telemarketing call to his cell phone number on August 29, 2019, from caller ID (813) 566-0836.

104.    HII paid for part or all of this call.

105.    Plaintiff called the (813) 566-0836 number back minutes later, and spoke with a representative who attempted to sell him health insurance. This call was disconnected early into the call due to apparent connectivity issues.

106.    Plaintiff called the (813) 566-0836 number back immediately after being disconnected, and spoke with another representative who again attempted to sell him health insurance. This call was similarly disconnected early into the call due to apparent connectivity issues.

107.    Plaintiff called the number back a third time that same day, and was again connected to a live representative.

108.    The representative—who later identified herself as "Janell" with "One Stop Health" (an HII lead generator)—proceeded to attempt to sell Plaintiff insurance. After Plaintiff provided her with basic health information, a budget, his ZIP code, and other personal information, Janell went on to quote him for an individual, $694.16/month policy that covered him for 100% preventative wellness services, $2,500 doctor co-pay, $2 million annual budget cap, prescription coverage, accidental death and dismemberment and critical illness benefits, and other benefits.

109.    Janell followed a script provided by HII.

110.    Plaintiff used the name "Michael Charles" in connection with this transaction.

18

111.    Plaintiff told Janell that he did not want to be contacted by phone, who confirmed that she would mark his phone number "as a DNC"—signifying that she agreed that Plaintiff was not to be called again.

112.    Janell provided Plaintiff with her contact number of (800) 838-4852 extension 808, and then transferred Plaintiff to what she called the "verification department."

113.    Plaintiff answered the verification department representative's questions, and again confirmed that he didn't want to be contacted on his phone number.

114.    In coordination with its lead generator, and with Plaintiff still on the line, HII then emailed Plaintiff a link to the application materials attached as Exhibit G through its MyBenefitsKeeper platform.

115.    The application materials Plaintiff received consisted of a pre-filled application for an "AdvantHealth STM" plan through American Financial, accidental death and dismemberment coverage through Federal Insurance, NCE membership, telephonic doctor services through Teladoc, and membership in a health education program, NCE/NBBI, Med-Sense, and the Rx Helpline discount program. Exhibit G. The application materials also included terms and conditions indicating that billing would be handled via HII's MyBenefitsKeeper platform. Id.

116.    Plaintiff attempted to complete the transaction with the verification department through HII's MyBenefitsKeeper platform, but the payment didn't go through.

117.    The call ended with Plaintiff again telling the verification department that he didn't want any calls to his cell phone number, to which the representative agreed.

118.    Plaintiff believed the representations during the call about on whose behalf the call was made, and continued to engage with the caller relying upon such. Plaintiff's belief that

the call was made to sell these products and services was both reasonable, and correct: The August 29, 2019 call was in fact made on behalf of Defendants HII, American Financial, Federal Insurance, Med-Sense, NCE, and NBBI, as well as Teladoc, Rx Helpline, and others.

119.    Plaintiff never consented to being called by or on behalf of any Defendant.

120.    Plaintiff has recordings of many of the calls for HII and the Seller Defendants, including but not limited to the calls on November 26, 2018, February 13, 2019, May 22, 2019, August 14, 2019, and August 29, 2019.

121.    These calls continued repeatedly despite Plaintiff asking that such calling cease, and even after he filed this action.

122.    Plaintiff and the other class members were damaged by the calls listed above and described herein. These incoming calls seized Plaintiff's phone, and prevented him from using it for legitimate purposes. The calls were also a nuisance, and caused Plaintiff and the class members annoyance, invasion of privacy, wasted their time, trespass, and constituted a violation of Plaintiff and the class members' TCPA statutory rights.

**HII's Liability**

123.    Defendant HII is liable to Plaintiff and other class members for calls made to them in violation of the TCPA by persons whom it engaged to perform telemarketing-based lead generation, such as pursuant to contracts such as the business associate agreement attached as Exhibit A.

124.    HII - Direct Liability – HII was so involved in the making of the telemarketing calls to Plaintiff that it may be considered to have "made" those calls, because:

      a. HII Engaged agents and sub-agents to make telemarketing calls, as referenced in Exhibit A. HII did this for each call alleged above: August 8,

2018, November 26, 2018, February 13, 2019, March 5, 2019, May 22, 2019, August 14, 2019, and August 29, 2019, among possible others.

b. HII participated in the telemarketing calls to Plaintiff and the class by providing real-time quotation information to telemarketers on its web portal. HII did this during its calls to Plaintiff on November 26, 2018, February 13, 2019, and May 22, 2019. HII also did this when Plaintiff called the Caller ID back after being disconnected or missing a call on March 5, 2019, August 14, 2019, and August 29, 2019.

c. HII participated in the telemarketing calls by using its platform to email contracts to call recipients, such as it did with Plaintiff on February 13, 2019, May 22, 2019, August 14, 2019, and August 29, 2019.

125.  HII – Actual Authority/Agency (Express and Implied) – HII should be held liable pursuant to an Actual Authority theory, because:

a. HII authorized the caller to call Plaintiff and the class for each of the calls at issue, such as the calls to Plaintiff on August 8, 2018, November 26, 2018, February 13, 2019, March 5, 2019, May 22, 2019, August 14, 2019, and August 29, 2019, among possible others.

b. HII paid for all or part of the telemarketing calls Plaintiff and the class received, including the ones to Plaintiff on August 8, 2018, November 26, 2018, February 13, 2019, March 5, 2019, May 22, 2019, August 14, 2019, and August 29, 2019 listed above.

c. HII disregarded any and all agreements with agents and telemarketers concerning TCPA compliance, instead creating a course of dealings whereby

it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.

d.  HII controlled the telemarketing at issue by providing real-time quotations for insurance and other health-related products and services, during the calls at issue in this case. Those quotes for HII and the other Seller Defendants' products were the purpose of these calls.

e.  HII provided the telemarketing scripts for the calls, including the examples attached as Exhibits B and C.

126.  HII – Apparent Agency – HII should be held liable for the calls to Plaintiff on an apparent agency theory because:

a.  HII authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the calls Plaintiff received on  August 8, 2018, November 26, 2018, February 13, 2019, March 5, 2019, May 22, 2019, August 14, 2019, and August 29, 2019, among possible others.

b.  HII authorized its agents and telemarketers to use its name or trade names during telemarketing calls, as happened on the February 13, 2019, May 22, 2019, August 14, 2019, and August 29, 2019 calls with Plaintiff, during which the telemarketer utilized HII's MyBenefitsKeeper platform with Plaintiff.

c.  HII provided the sole mechanism for purchasing the goods and services being sold through the telemarketing, and directed that telemarketers use that portal and its emails to sell its goods and services. HII labeled its emails sent

pursuant to this practice prominently with HII's "MyBenefitsKeeper" brand.

d. Based upon the above, Plaintiff, and other consumers like him, reasonably believed that HII was in charge of the telemarketing scheme, was responsible for the telemarketing at issue, was selling the Seller Defendants' products and services through such telemarketing, and administering the plans, once sold.

127. <u>HII – Ratification</u> – HII should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

a. HII – including its compliance and legal departments – knew that its insurance agents such as those it contracted with in <u>Exhibit A</u> and the persons who called Plaintiff on, for example, August 8, 2018, November 26, 2018, February 13, 2019, March 5, 2019, May 22, 2019, August 14, 2019, and August 29, 2019, were making nonconsensual, prerecorded telemarketing calls and telemarketing with noncompliant internal DNC policies, including the ones to Plaintiff.

b. HII participated in the calls to Plaintiff by providing pricing and quotation information, as well as contracts for insurance, including after it had been sued by Plaintiff and other litigants for these exact same violations,[1] and

---

[1]     *E.g., Moser v. Health Ins. Innovations, Inc.*, No. 17-1127, 2018 WL 325112, at *7 (S.D. Cal. Jan. 5, 2018) (declining to dismiss claims in putative class action in which HII was similarly alleged to be "the principle actor in a scheme to sell ... insurance related services ... by making illegal telemarketing calls prohibited by the [TCPA]"); *Moser v. Health Ins. Innovations, Inc.*, No. 17-1127, 2019 WL 3719889 (S.D. Cal. Aug. 7, 2019) (certifying litigation class); *Cunningham v. Health Plan Intermediaries Holdings, LLC*, No. 18-919, 2018 WL 7350924, at *3 (M.D. Fla. Nov. 15, 2018) (denying motion to dismiss TCPA action against HII subsidiary); *Izor v. Health Ins. Innovations, Inc.*, No. 8:19-cv-01065 (M.D. Fla. filed May 2, 2019) (TCPA class action against HII).

despite admitted concern about potential exposure as a result of such.[2]

c.  HII continued to reap the benefits of its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing derived from such calls for MyBenefitsKeeper and other HII products and services, obtaining compensation from Seller Defendants and others as a result of business derived from such calls, and acquiring ongoing relationships (and resulting revenue) in relation to its administration and billing management as to the products and services purchased by call recipients as a result of these calls.

d.  HII instituted a policy, practice or procedure of trying to maintain an *appearance* of TCPA compliance on "paper" such as in <u>Exhibit A</u>. In practice and in reality, however, it intentionally addressed ongoing issues concerning telemarketing violations largely through verbal communications and misdirection, designed to allow it to continue reaping the benefits of illegal telemarketing with legal impunity.

e.  HII paid for all or part of the telemarketing at issue here.

f.  HII provided the scripts for the telemarketing calls. *E.g.,* <u>Exhibits B-C</u>.

g.  HII benefitted from the telemarketing in the sense that its products and services were being marketed, and in the sense that it was fulfilling its duties

---

[2]     *See, e.g.,* HII Form 10-K (Mar. 2, 2017) ("[W]e are subject to various federal and state telemarketing regulations, including the [TCPA] and the FCC's implementing regulations, as well as various state telemarketing laws and regulations. We, our distributors, and our carriers have been, and may continue to be, the subject of allegations of TCPA violations, and we could be responsible for some of the costs incurred by distributors or carriers who are the subject of allegations of TCPA violations. Any violation of these regulations could expose us to damages for monetary loss, statutory damages, fines, penalties and/or regulatory inquiries.") (available at www.sec.gov/Archives/edgar/data/1561387/000149315217002078/form10-k.htm).

to the Seller Defendants in attempting to sell their products and services.

    h.   HII ratified these calls by emailing contracts and quotes for insurance to Plaintiff and others, by handling billing and providing other administrative services as to the products and services purchased through these calls on an ongoing basis, and in retaining financial payment for such, including through retention of a portion of the premium and other fees and charges to the consumer call recipient. *See, e.g.,* <u>Exhibit F</u> at 13 (confirming payment will be automatically processed each month through HII's MyBenefitsKeeper platform).

128.    To the extent HII has an internal Do Not Call policy, such policy does not include coordinating with and among lead generators to ensure that persons who ask not to be called are not again called on behalf of HII. Additionally or alternatively, to the extent any policy of HII called for this, it was not implemented or honored.

129.    Plaintiff has been directly affected by HII's failures with regard to internal Do Not Call. Although he has repeatedly asked Defendant's lead generators to stop calling and has filed a federal lawsuit against them for internal DNC noncompliance, HII's lead generators have continued to call Plaintiff's cell phone.

130.    HII's lead generators made more than 10,000 calls to unique cellular telephone numbers using an unattended message on its behalf, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

**American Financial's Liability**

131.    Defendant American Financial is liable to Plaintiff and other class members for telemarketing calls that sold or attempted to sell its goods and services, as explained below:

132.    American Financial – Actual Authority/Agency (Express and Implied) – American Financial should be held liable pursuant to an Actual Authority theory, because:

   a.    American Financial, through its agreements with HII and direct relationship with the insurance agent, authorized the calls at issue made on its behalf to Plaintiff and the class, such as the calls to Plaintiff on November 26, 2018 and February 13, 2019, among possible others.

   b.    American Financial created a course of dealings with HII and the telemarketers at issue here whereby it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.

   c.    American Financial controlled the telemarketing at issue by providing its proprietary product and pricing information to HII and its lead generators for use in the calls, and by authorizing them to use such information, and its tradename, in generating sales of its products and services to call recipients under the terms it provided. American Financial had the right to control the telemarketing, too; for example it could demand that HII or its insurance agents disclose the source of new business, and refuse prospective customers that arose from telemarketing. American Financial chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

   d.    American Financial also reviewed and approved the telemarketing scripts for

26

the calls made to generate business on its behalf.

133.    <u>American Financial – Apparent Agency</u> – American Financial should be held liable for the calls to Plaintiff on an apparent agency theory because:

a.    American Financial authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the calls Plaintiff received on November 26, 2018 and February 13, 2019, among possible others.

b.    American Financial authorized HII and its agents and telemarketers to use its trade name during telemarketing calls, as happened on the November 26, 2018 and February 13, 2019 calls with Plaintiff, *e.g.,* <u>Exhibit D</u> at pp. 2, 6.

c.    American Financial provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

d.    Upon a sale derived from these calls, American Financial proceeded to provide the insurance coverage or other product or service purchased, including retaining amounts paid by the call recipient in connection with the policy.

e.    Based upon the above, Plaintiff, and other consumers like him, reasonably believed that American Financial authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

134.    <u>American Financial – Ratification</u> – American Financial should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

a. American Financial – including its compliance and legal departments – knew that the insurance agents who called Plaintiff on its behalf through its agreement with HII, such as the persons who called Plaintiff on, for example, November 26, 2018 and February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including the ones to Plaintiff.

b. American Financial ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with HII despite being on notice of the illegal nature of the calling being done on its behalf, including after it had been sued by Plaintiff.

c. American Financial continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability to grant or deny applications as to its products and services made as a result of such calls, selling insurance through them, and retaining resulting revenue.

d. American Financial instituted a policy, practice or procedure of trying to maintain an *appearance* of TCPA compliance on "paper" through its agreements with HII and its insurance agents. In practice and in reality, however, it intentionally addressed ongoing issues concerning telemarketing violations largely through verbal communications and misdirection, designed to allow it to continue reaping the benefits of illegal telemarketing with legal

28

impunity.

    e.   American Financial compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit HII to retain portions of the insurance premiums obtained as a result of such calls.

    f.   American Financial reviewed and approved the scripts for the telemarketing calls made on its behalf.

    g.   American Financial benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial benefit of payment for its products and services by consumers who purchased them as a result of these calls.

135.   American Financial's products or services were pitched by an HII lead generator on more than 10,000 calls to unique cellular telephone numbers called using an unattended message, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

<strong><u>Federal Insurance's Liability</u></strong>

136.   Defendant Federal Insurance is liable to Plaintiff and other class members for telemarketing calls that sold or attempted to sell its goods and services, as explained below.

137.   <u>Federal Insurance – Actual Authority/Agency (Express and Implied)</u> – Federal Insurance should be held liable pursuant to an Actual Authority theory, because:

    a.   Federal Insurance, through its agreements with HII and direct relationship with the insurance agent, authorized the calls at issue made on its behalf to

29

Plaintiff and the class, such as the call to Plaintiff on February 13, 2019, among possible others.

b.  Federal Insurance created a course of dealings with HII and the telemarketers at issue here whereby it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.

c.  Federal Insurance controlled the telemarketing at issue by providing its proprietary product and pricing information to HII and its lead generators for use in the calls, and by authorizing them to use such information, and its tradename, in generating sales of its products and services to call recipients under the terms it provided. Federal Insurance had the right to control the telemarketing, too; for example it could demand that HII or its insurance agents disclose the source of new business, and refuse prospective customers that arose from telemarketing. Federal Insurance chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

d.  Federal Insurance also reviewed and approved the telemarketing scripts for the calls made to generate business on its behalf.

138.  <u>Federal Insurance – Apparent Agency</u> – Federal Insurance should be held liable for the calls to Plaintiff on an apparent agency theory because:

a.  Federal Insurance authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the call Plaintiff received on February 13, 2019, among possible others.

b.  Federal Insurance authorized HII and its agents and telemarketers to use its trade name during telemarketing calls, as happened on the February 13, 2019

call with Plaintiff, *see* <u>Exhibit D</u> at pp. 3, 8.

    c.  Federal Insurance provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

    d.  Upon a sale derived from these calls, Federal Insurance proceeded to provide the insurance coverage or other product or service purchased, including retaining amounts paid by the call recipient in connection with the policy.

    e.  Based upon the above, Plaintiff, and other consumers like him, reasonably believed that Federal Insurance authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

139.  <u>Federal Insurance – Ratification</u> – Federal Insurance should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

    a.  Federal Insurance – including its compliance and legal departments – knew that the insurance agents who called Plaintiff on its behalf through its agreement with HII, such as the persons who called Plaintiff on, for example, February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including as to Plaintiff.

    b.  Federal Insurance ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with HII despite being on notice of the illegal nature of the calling being done on its

behalf, including after it had been sued by Plaintiff.

c.  Federal Insurance continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability to grant or deny applications as to its products and services made as a result of such calls, selling insurance through them, and retaining resulting revenue.

d.  Federal Insurance instituted a policy, practice or procedure of trying to maintain an *appearance* of TCPA compliance on "paper" through its agreements with HII and its insurance agents. In practice and in reality, however, it intentionally addressed ongoing issues concerning telemarketing violations largely through verbal communications and misdirection, designed to allow it to continue reaping the benefits of illegal telemarketing with legal impunity.

e.  Federal Insurance compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit HII to retain portions of the insurance premiums obtained as a result of such calls.

f.  Federal Insurance reviewed and approved the scripts for the telemarketing calls made on its behalf.

g.  Federal Insurance benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial

32

benefit of payment for its products and services by consumers who purchased

them as a result of these calls.

140.    Federal Insurance's products or services were pitched by an HII lead generator on

more than 10,000 calls to unique cellular telephone numbers called using an unattended message,

where the recipient never provided his or her phone number to them to be called, including at

least twice after a request to stop calling.

**Med-Sense's Liability**

141.    Defendant Med-Sense is liable to Plaintiff and other class members for

telemarketing calls that sold or attempted to sell its goods and services, as explained below.

142.    <u>Med-Sense</u> – Actual Authority/Agency (Express and Implied) – Med-Sense

should be held liable pursuant to an Actual Authority theory, because:

     a.   Med-Sense, through its agreements with HII, authorized the calls at issue

made on its behalf to Plaintiff and the class, such as the call to Plaintiff on

February 13, 2019, among possible others.

     b.   Med-Sense created a course of dealings with HII and the telemarketers at

issue here whereby it continued to pay for and accept the benefit of illegal

telemarketing in spite of contractual terms that mention compliance.

     c.   Med-Sense controlled the telemarketing at issue by providing its proprietary

product and pricing information to HII and its lead generators for use in the

calls, and by authorizing them to use such information, and its tradename, in

generating sales of its products and services to call recipients under the terms

it provided. Med-Sense had the right to control the telemarketing, too; for

example it could demand that HII or its lead generators disclose the source of

new business, and refuse prospective customers that arose from telemarketing. Med-Sense chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

    d.  Med-Sense also reviewed and approved the telemarketing scripts for the calls made to generate business on its behalf.

143.   <u>Med-Sense</u> – Apparent Agency – Med-Sense should be held liable for the calls to Plaintiff on an apparent agency theory because:

    a.  Med-Sense authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the call Plaintiff received on February 13, 2019, among possible others.

    b.  Med-Sense authorized HII and its agents and telemarketers to use its trade name during telemarketing calls, as happened on the February 13, 2019 call with Plaintiff, *see* <u>Exhibit D</u> at p. 9.

    c.  Med-Sense provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

    d.  Upon a sale derived from these calls, Med-Sense proceeded to provide the product or service purchased, including retaining amounts paid by the call recipient in connection with the membership, plan, or policy.

    e.  Based upon the above, Plaintiff, and other consumers like him, reasonably believed that Med-Sense authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

144.   <u>Med-Sense</u> – Ratification – Med-Sense should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

a.  Med-Sense – including its compliance and legal departments – knew that the lead generators who called Plaintiff on its behalf through its agreement with HII, such as the persons who called Plaintiff on, for example, February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including as to Plaintiff.

b.  Med-Sense ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with HII despite being on notice of the illegal nature of the calling being done on its behalf, including despite knowledge of lawsuits against HII for these same violations.

c.  Med-Sense continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability to grant or deny applications as to its products and services made as a result of such calls, selling its products and services through them, and retaining resulting revenue.

d.  Med-Sense instituted a policy, practice or procedure of trying to maintain an appearance of TCPA compliance on "paper" through its agreements with HII and its lead generators. In practice and in reality, however, it intentionally addressed ongoing issues concerning telemarketing violations largely

35

through verbal communications and misdirection, designed to allow it to continue reaping the benefits of illegal telemarketing with legal impunity.

e. Med-Sense compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit HII to retain portions of the fees obtained as a result of such calls.

f. Med-Sense reviewed and approved the scripts for the telemarketing calls made on its behalf.

g. Med-Sense benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial benefit of payment for its products and services by consumers who purchased them as a result of these calls.

145. Med-Sense's products or services were pitched by an HII lead generator on more than 10,000 calls to unique cellular telephone numbers called using an unattended message, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

## NCE's Liability

146. Defendant NCE is liable to Plaintiff and other class members for telemarketing calls that sold or attempted to sell its goods and services, as explained below.

147. <u>NCE</u> – Actual Authority/Agency (Express and Implied) – NCE should be held liable pursuant to an Actual Authority theory, because:

a. NCE, through its agreements with HII, authorized the calls at issue made on its behalf to Plaintiff and the class, such as the call to Plaintiff on February

13, 2019, among possible others

b.  NCE created a course of dealings with HII and the telemarketers at issue here whereby it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.

c.  NCE controlled the telemarketing at issue by providing its proprietary product and pricing information to HII and its lead generators for use in the calls, and by authorizing them to use such information, and its tradename, in generating sales of its products and services to call recipients under the terms it provided. NCE had the right to control the telemarketing, too; for example it could demand that HII or its lead generators disclose the source of new business, and refuse prospective customers that arose from telemarketing. NCE chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

d.  NCE also reviewed and approved the telemarketing scripts for the calls made to generate business on its behalf.

148.  <u>NCE</u> – Apparent Agency – NCE should be held liable for the calls to Plaintiff on an apparent agency theory because:

a.  NCE authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the call Plaintiff received on February 13, 2019, among possible others.

b.  NCE authorized HII and its agents and telemarketers to use its trade name during telemarketing calls, as happened on the February 13, 2019 call with Plaintiff, *see* <u>Exhibit D</u> at p. 4.

c.  NCE provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

d.  Upon a sale derived from these calls, NCE proceeded to provide the product or service purchased, including retaining amounts paid by the call recipient in connection with the membership, plan, or policy.

e.  Based upon the above, Plaintiff, and other consumers like him, reasonably believed that NCE authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

149.  NCE – Ratification – NCE should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

a.  NCE – including its compliance and legal departments – knew that the lead generators who called Plaintiff on its behalf through its agreement with HII, such as the persons who called Plaintiff on, for example, February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including as to Plaintiff.

b.  NCE ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with HII despite being on notice of the illegal nature of the calling being done on its behalf, including despite knowledge of lawsuits against it and HII for these same violations,

*see, e.g., Bilek v. NCE*, No. 1:18-cv-03083 (N.D. Ill. filed Apr. 30, 2018).

c.  NCE continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability to grant or deny applications as to its products and services made as a result of such calls, selling its products and services through them, and retaining resulting revenue.

d.  Despite receiving consumer complaints and even being sued previously for telemarketing violations, NCE failed to implement appropriate do-not-call policies or other efforts to ensure TCPA compliance, let alone take any effort to correct the violations it knew were occurring on its behalf through HII and its lead generators.

e.  Instead, NCE compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit HII to retain portions of the fees obtained as a result of such calls.

f.  NCE reviewed and approved the scripts for the telemarketing calls made on its behalf.

g.  NCE benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial benefit of payment for its products and services by consumers who purchased them as a result of these calls.

150.  NCE's products or services were pitched by an HII lead generator on more than

39

10,000 calls to unique cellular telephone numbers called using an unattended message, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

### NBBI's Liability

151.    NBBI provides services offered to NCE members and customers, which NCE then rebrands using its trade name. *See, e.g.,* Exhibit G at p. 19 (application materials emailed by HII to Plaintiff as a result of August 29, 2029 call, identifying NCE-branded "NCE Dentachoice" program offered by NCE, but explaining that it is administered through NBBI).

152.    NBBI works closely with NCE to facilitate the sale of NCE-branded products and services, including reviewing and approving scripts, and providing plan information to NCE for use by HII and its lead generators, keeping track of customers obtained through such lead generation, and facilitating performance of the purchased products and services.

153.    Defendant NBBI is liable to Plaintiff and other class members for telemarketing calls that sold or attempted to sell its goods and services, as explained below.

154.    NBBI – Actual Authority/Agency (Express and Implied) – NBBI should be held liable pursuant to an Actual Authority theory, because:

> a.   NBBI, through its agreements with NCE, authorized the calls at issue made on its behalf to Plaintiff and the class through HII, such as the call to Plaintiff on February 13, 2019, among possible others
>
> b.   NBBI created a course of dealings with NCE, HII, and the telemarketers at issue here whereby it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.
>
> c.   NBBI controlled the telemarketing at issue by providing its proprietary

product and pricing information to NCE to provide to HII and its lead generators for use in the calls, and by authorizing them to use such information, and its tradename, in generating sales of its products and services to call recipients under the terms it provided. NBBI had the right to control the telemarketing, too; for example it could demand that NCE have HII or its lead generators disclose the source of new business, and refuse prospective customers that arose from telemarketing. NBBI chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

d. NBBI also reviewed and approved the telemarketing scripts for the calls made to generate business on its behalf.

155. <u>NBBI</u> – Apparent Agency – NBBI should be held liable for the calls to Plaintiff on an apparent agency theory because:

a. NBBI authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the call Plaintiff received on February 13, 2019, among possible others.

b. NBBI, through NCE, authorized HII and its agents and telemarketers to use its trade name during telemarketing calls. *See, e.g.,* <u>Exhibit G</u> at p. 19.

c. NBBI, through NCE, provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

d. Upon a sale derived from these calls, NBBI coordinated with its partner AccessOne to provide the product or service purchased, including retaining amounts paid by the call recipient in connection with the membership, plan,

or policy.

    e.   Based upon the above, Plaintiff, and other consumers like him, reasonably believed that NBBI authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

156.   <u>NBBI</u> – Ratification – NBBI should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

    a.   NBBI – including its compliance and legal departments – knew that the lead generators who called Plaintiff on its behalf through NCE's agreement with HII, such as the persons who called Plaintiff on, for example, February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including as to Plaintiff.

    b.   NBBI ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with NCE (and thus HII) despite being on notice of the illegal nature of the calling being done on its behalf, including despite knowledge of lawsuits against NCE for these same violations, including, for example, *Bilek v. NCE*, No. 1:18-cv-03083 (N.D. Ill. filed Apr. 30, 2018).

    c.   NBBI continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability

to grant or deny applications as to its products and services made as a result of such calls, selling its products and services through them, and retaining resulting revenue.

d. NBBI, through NCE, compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit them to retain portions of the fees obtained as a result of such calls.

e. NBBI reviewed and approved the scripts for the telemarketing calls made on its behalf.

f. NBBI benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial benefit of payment for its products and services by consumers who purchased them as a result of these calls.

157. NBBI's products or services were pitched by an HII lead generator on more than 10,000 calls to unique cellular telephone numbers called using an unattended message, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

**Rx Helpline's Liability**

158. Defendant Rx Helpline is liable to Plaintiff and other class members for telemarketing calls that sold or attempted to sell its goods and services, as explained below.

159. <u>Rx Helpline</u> – Actual Authority/Agency (Express and Implied) – Rx Helpline should be held liable pursuant to an Actual Authority theory, because:

a. Rx Helpline, through its agreements with HII, authorized the calls at issue

made on its behalf to Plaintiff and the class, such as the call to Plaintiff on February 13, 2019, among possible others.

b.  Rx Helpline created a course of dealings with HII and the telemarketers at issue here whereby it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.

c.  Rx Helpline controlled the telemarketing at issue by providing its proprietary product and pricing information to HII and its lead generators for use in the calls, and by authorizing them to use such information, and its tradename, in generating sales of its products and services to call recipients under the terms it provided. Rx Helpline had the right to control the telemarketing, too; for example it could demand that HII or its lead generators disclose the source of new business, and refuse prospective customers that arose from telemarketing. Rx Helpline chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

d.  Rx Helpline also reviewed and approved the telemarketing scripts for the calls made to generate business on its behalf.

160.  <u>Rx Helpline</u> – Apparent Agency – Rx Helpline should be held liable for the calls to Plaintiff on an apparent agency theory because:

a.  Rx Helpline authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the call Plaintiff received on February 13, 2019, among possible others.

b.  Rx Helpline authorized HII and its agents and telemarketers to use its trade name during telemarketing calls, as happened on the February 13, 2019 call

44

with Plaintiff, *see* <u>Exhibit D</u> at pp. 2-3.

    c.   Rx Helpline provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

    d.   Upon a sale derived from these calls, Rx Helpline proceeded to provide the product or service purchased, including retaining amounts paid by the call recipient in connection with the membership, plan, or policy.

    e.   Based upon the above, Plaintiff, and other consumers like him, reasonably believed that Rx Helpline authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

161.   <u>Rx Helpline</u> – Ratification – Rx Helpline should be held liable for the calls to Plaintiff and the class on a ratification theory, because:

    a.   Rx Helpline – including its compliance and legal departments – knew that the lead generators who called Plaintiff on its behalf through its agreement with HII, such as the persons who called Plaintiff on, for example, February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including as to Plaintiff.

    b.   Rx Helpline ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with HII despite being on notice of the illegal nature of the calling being done on its behalf,

including despite knowledge of lawsuits against HII for these same violations.

c.  Rx Helpline continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability to grant or deny applications as to its products and services made as a result of such calls, selling its products and services through them, and retaining resulting revenue.

d.  Rx Helpline instituted a policy, practice or procedure of trying to maintain an appearance of TCPA compliance on "paper" through its agreements with HII and its lead generators. In practice and in reality, however, it intentionally addressed ongoing issues concerning telemarketing violations largely through verbal communications and misdirection, designed to allow it to continue reaping the benefits of illegal telemarketing with legal impunity.

e.  Rx Helpline compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit HII to retain portions of the fees obtained as a result of such calls.

f.  Rx Helpline reviewed and approved the scripts for the telemarketing calls made on its behalf.

g.  Rx Helpline benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial benefit of payment for its products and services by consumers who purchased

them as a result of these calls.

162.     Rx Helpline's products or services were pitched by an HII lead generator on more than 10,000 calls to unique cellular telephone numbers called using an unattended message, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

### Teladoc's Liability

163.     Defendant Teladoc is liable to Plaintiff and other class members for telemarketing calls that sold or attempted to sell its goods and services, as explained below.

164.     Teladoc – Actual Authority/Agency (Express and Implied) – Teladoc should be held liable pursuant to an Actual Authority theory, because:

     a.  Teladoc, through its agreements with HII, authorized the calls at issue made on its behalf to Plaintiff and the class, such as the call to Plaintiff on February 13, 2019, among possible others.

     b.  Teladoc created a course of dealings with HII and the telemarketers at issue here whereby it continued to pay for and accept the benefit of illegal telemarketing in spite of contractual terms that mention compliance.

     c.  Teladoc controlled the telemarketing at issue by providing its proprietary product and pricing information to HII and its lead generators for use in the calls, and by authorizing them to use such information, and its tradename, in generating sales of its products and services to call recipients under the terms it provided. Teladoc had the right to control the telemarketing, too; for example it could demand that HII or its lead generators disclose the source of new business, and refuse prospective

customers that arose from telemarketing. Teladoc chose not to do so, and instead chose to continue reaping the benefits of the illegal calls.

d. Teladoc also reviewed and approved the telemarketing scripts for the calls made to generate business on its behalf.

165. <u>Teladoc</u> – Apparent Agency – Teladoc should be held liable for the calls to Plaintiff on an apparent agency theory because:

a. Teladoc authorized the sale of its goods and services to be made during telemarketing calls to Plaintiff and the class, including on the call Plaintiff received on February 13, 2019, among possible others.

b. Teladoc authorized HII and its agents and telemarketers to use its trade name during telemarketing calls, as happened on the February 13, 2019 call with Plaintiff, *see* <u>Exhibit D</u> at p. 2.

c. Teladoc provided HII and its agents and telemarketers with its proprietary product and pricing information necessary to issue quotes for, and effectuate sales of, its products and services.

d. Upon a sale derived from these calls, Teladoc proceeded to provide the product or service purchased, including retaining amounts paid by the call recipient in connection with the membership, plan, or policy.

e. Based upon the above, Plaintiff, and other consumers like him, reasonably believed that Teladoc authorized the telemarketing scheme, was ultimately responsible for the telemarketing at issue, and approved the selling of its products and services through such telemarketing.

166. <u>Teladoc</u> – Ratification – Teladoc should be held liable for the calls to Plaintiff and

the class on a ratification theory, because:

    a.  Teladoc – including its compliance and legal departments – knew that the lead generators who called Plaintiff on its behalf through its agreement with HII, such as the persons who called Plaintiff on, for example, February 13, 2019, were making nonconsensual, prerecorded telemarketing calls, including as to Plaintiff.

    b.  Teladoc ratified the calls to Plaintiff by providing proprietary product and pricing information to permit the issuance of quotes and sales resulting from these calls, continuing to authorize the use of its trade name during these calls, and by continuing to maintain its relationship with HII despite being on notice of the illegal nature of the calling being done on its behalf, including despite knowledge of lawsuits against HII for these same violations.

    c.  Teladoc continued to reap the benefits of HII and its agents' telemarketing calls, despite that it knew the calls were illegal. The benefits reaped included enjoying the marketing/advertising derived from such calls, having the ability to grant or deny applications as to its products and services made as a result of such calls, selling its products and services through them, and retaining resulting revenue.

    d.  Teladoc instituted a policy, practice or procedure of trying to maintain an appearance of TCPA compliance on "paper" through its agreements with HII and its lead generators. In practice and in reality, however, it intentionally addressed ongoing issues concerning telemarketing violations largely through verbal communications and misdirection, designed to allow it to

continue reaping the benefits of illegal telemarketing with legal impunity.

    e.   Teladoc compensated HII and its lead generators for all or part of the telemarketing at issue here, including, for example, by agreeing to permit HII to retain portions of the fees obtained as a result of such calls.

    f.   Teladoc reviewed and approved the scripts for the telemarketing calls made on its behalf.

    g.   Teladoc benefitted from the telemarketing by virtue of having its products and services advertised to consumers, having the option to accept or reject applications for its products and services, and in retaining the financial benefit of payment for its products and services by consumers who purchased them as a result of these calls.

167.   Teladoc's products or services were pitched by an HII lead generator on more than 10,000 calls to unique cellular telephone numbers called using an unattended message, where the recipient never provided his or her phone number to them to be called, including at least twice after a request to stop calling.

**<u>Class Action Allegations</u>**

168.   Plaintiff brings this action on behalf of a class consisting of:

<u>Prerecorded Voice Class</u>: All persons in the United States whose cellular telephone number was called (a) for the purpose of offering for sale any Defendant's products or services, (b) where a voice recording was played during such call, (c) where the sales pitch was facilitated through use of HII's internet platform, and (d) where no Defendant has an executed written agreement from the recipient of the call that specifies that the Defendant may call their cell phone number using a prerecorded voice.

<u>Internal DNC Class</u>: All persons in the United States whose residential telephone number any lead generator or insurance agent vendor or subvendor of HII called at least twice in any 12-month period for the purpose of encouraging the purchase of goods or services, despite the consumer having

made a prior do-not-call request.

169.     Plaintiff alleges that each Defendant should be held liable for calls during which any of its products or services were pitched or quoted, except that HII should be held jointly and severally liable for each call. Upon information and belief, HII has records showing which Defendant(s) should be held liable for which calls.

170.     Common questions of law or fact exist as to all members of the class, which predominate over any questions solely affecting any individual member, including Plaintiff. Such questions common to the class include but are not limited to:

a.   Whether the calls to Plaintiff and the class were made using a "artificial or prerecorded voice" as such terms are defined or understood under the TCPA and applicable FCC regulations and orders

b.   Whether Defendants had prior express consent to call the cell phone numbers of Plaintiff and the other members of the class;

c.   Whether HII violated the TCPA's internal Do Not Call rules; and

d.   Damages, including whether any violations were performed willfully or knowingly such that Plaintiff and the other members of the class are entitled to treble damages under 47 U.S.C. § 227(b)(3) or § 227(c)(5).

171.     Plaintiff's claims are typical of the claims of the other members of the class. The factual and legal bases of Defendants' liability to Plaintiff and the other members of the class are the same: Defendants violated the TCPA by causing automated, nonconsensual calls to be made to the cellular telephone number of each member of the class, including, as to the sub-class, repeatedly after a request to stop.

172.     Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has

no interests that might conflict with the interests of the class. Plaintiff is interested in pursuing his claims vigorously, and he has retained counsel competent and experienced in class and complex litigation, including with regards to the claims alleged herein.

173.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual action would entail. There are, on information and belief, thousands of class members, such that joinder of all members is impracticable.

174.    No difficulties are likely to be encountered in the management of this action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

175.    Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the other members of the class, thereby making relief appropriate with respect to the class as a whole. Prosecution of separate actions by individual members of the class, should they even realize that their rights have been violated, would likely create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct.

176.    The identity of the class is, on information and belief, readily identifiable from Defendants' records.

## COUNT I

**Violations of the TCPA, 47 U.S.C. § 227 (Prerecorded Calls)**
**Against Respective Defendants On Behalf of Plaintiff and the Prerecorded Call Class**

177.    Plaintiff re-alleges and incorporates Paragraphs 1-122 and 168-176 as to all Defendants, Paragraphs 123-130 as to HII, Paragraphs 131-135 as to American Financial, Paragraphs 136-140 as to Federal Insurance, Paragraphs 141-145 as to Med-Sense, Paragraphs 146-150 as to NCE, Paragraphs 151-157 as to NBBI, Paragraphs 158-162 as to Rx Helpline, and Paragraphs 163-167 as to Teladoc, as if fully set forth herein. Plaintiff asserts this Count I against each identified Defendant for the calls made on its behalf.

178.    It is a violation of the TCPA to make "any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." 47 U.S.C. § 227(b)(1)(A)(iii).

179.    Each Defendant initiated or caused to be initiated calls to the cellular telephone numbers of Plaintiff and the other members of the Prerecorded Call Class using an automatic telephone dialing system or an artificial or prerecorded voice. The Seller Defendants are liable for the calls during which their products or services were marketed, quoted or sold. As to Plaintiff, for example, this means the following Defendants are liable for the following calls:

a.  HII is liable for the calls on August 8, 2018, November 26, 2018, and February 13, 2019;

b.  American Financial is liable for the calls to Plaintiff on November 26, 2018, and February 13, 2019;

c.  Federal Insurance is liable for the February 13, 2019 call;

d.  Med-Sense is liable for the February 13, 2019 call;

      e.  NCE is liable for the February 13, 2019;

      f.  NBBI is liable for the February 13, 2019 call;

      g.  Teledoc is liable for the February 13, 2019 call; and

      h.  RX Helpline is liable for the February 13, 2019 call;

180.    These calls were made without regard to whether or not there was consent or permission from Plaintiff or other members of the Prerecorded Call Class to make such calls. In fact, no Defendant had prior express consent to call the cell phone numbers of Plaintiff and the other members of the Prerecorded Call Class when the calls were made.

181.    Defendants' prerecorded calls did not specify the caller, or conform to the notice requirements of the TCPA, including for example as delineated in 47 C.F.R. § 64.1200(b). In fact, the prerecorded calls generally misled call recipients as to the nature of the caller.

182.    And while some (but not all) of Defendants' prerecorded calls included opt-out mechanisms, those mechanisms were not used or honored.

183.    Defendants' calls and violations were negligent. Alternatively, they were willful or knowing.

184.    Defendants violated the TCPA by making non-emergency calls to the cell phones of Plaintiff and other Prerecorded Call Class members using an artificial or prerecorded voice, without prior express consent.

185.    On information and belief, some of the calls to Plaintiff and the Prerecorded Call Class were made by vendors of Defendants. Defendants are liable for those calls, too.

186.    As a result of Defendants' conduct and pursuant to Section 227(b)(3) of the TCPA, Plaintiff and other members of the Prerecorded Call Class were harmed and are each entitled to a minimum of $500 in damages for each violation. Plaintiff and class are also entitled

to an injunction against future calls.  47 U.S.C. § 227(b)(3).

187.     Because Defendants knew or should have known that Plaintiff and the other members of the Prerecorded Call Class had not given prior express consent to receive its calls using an artificial or prerecorded voice to the cell phones of Plaintiff and the other class members—and/or willfully caused calls to be made to the cell phones of Plaintiff and the other members of the Prerecorded Call Class without prior express consent—the Court should treble the amount of statutory damages available to Plaintiff and the Prerecorded Call Class, pursuant to Section 227(b)(3) of the TCPA.

WHEREFORE, Plaintiff Robert Hossfeld, individually and on behalf of the Prerecorded Call Class, respectfully requests that the Court enter judgment against each Defendant for:

A.     Certification of the class as alleged herein;

B.     A declaration that each Defendant violated the TCPA as to Plaintiff and the class;

C.     Injunctive relief aimed at ensuring the prevention of each Defendant from violating the TCPA in the future;

D.     Damages pursuant to 47 U.S.C. § 227(b)(3), as applicable;

E.     Costs, expenses, and attorneys' fees, to the extent permitted by law; and

F.     Such other or further relief as the Court deems just and proper.

## COUNT II

### Violations of the TCPA, 47 U.S.C. § 227 (Internal DNC)
### Against HII On Behalf of Plaintiff and the Internal DNC Class

188.     Plaintiff re-alleges and incorporates Paragraphs 1-130 and 168-176 as to HII, as if fully set forth herein. Plaintiff asserts this Count II against Defendant HII, only.

189.     The TCPA requires any party that is engaged in telemarketing – including "sellers" who do not make calls themselves – to maintain and honor a written internal do-not-call

policy.

190.     Moreover, to the extent that third parties that "initiate" telemarketing on behalf of sellers do not have Do Not Call policies, or failed to implement them, the TCPA, 47 U.S.C. § 227(c)(5), provides that those on whose behalf illegal calls are made are to be held liable.

191.     Pursuant to the request of insurance agency State Farm in 2005, the FCC formally clarified and declared that:

> **Once the consumer makes a company specific do-not-call request, whether to the company or third party, the company and its third party telemarketer may not call the consumer again on behalf of that company to make a telephone solicitation regardless of whether the consumer continues to do business with the company.**

*In re Rules & Regs. Implementing the TCPA*, 20 FCC Rcd. 13664, 13666-13668, ¶ 7 (2005) (emphasis added). This ruling applies to "all" of the seller's telemarketers; not just the one that made the illegal call. *Id.* at ¶ 1. Thus, if a consumer requests not to be called during a telemarketing call, this request must be honored by the telemarketer, the seller, and all other telemarketers that generate business for the seller. *Id.*

192.     Neither any of the Defendants nor the entities that initiated the calls on its behalf had internal Do Not Call policies that comported with the above. Moreover, such noncompliance resulted in multiple subsequent telemarketing calls to persons Plaintiff and the other Internal DNC Class members, despite prior requests by them that calling cease.

193.     Each Defendant violated the TCPA by not having sufficient internal DNC policies and/or by not following or honoring the policies that it did have. Each Defendant is also liable under the TCPA because its telemarketers, including the entities that "initiated" the calls upon which this case is based, failed to have sufficient internal DNC policies. Additionally, neither any of the Defendants nor intermediary entities involved in the telemarketing referenced herein

were trained properly as to internal Do Not Call policies; for example but not by limitation, the rule set forth in the FCC's 2005 Declaratory Ruling.

194.   No Defendant was not permitted to accept business derived from any telemarketing initiated by entities whose internal Do Not Call policy did not comport with 47 C.F.R. § 64.1200(d). Because the entities that initiated calls on behalf of each Defendant did not comply with that regulation, the calls initiated by such entities were violations of the TCPA. Each Defendant is liable for such calls pursuant to 47 US.C. § 227(c)(5), because such calls were made on its behalf.

195.   As a result of each Defendant's conduct and pursuant to Section 227(c)(5) of the TCPA, Plaintiff and other members of the Internal DNC Class were harmed and are each entitled to up to $500 in damages for each violation. Plaintiff and the Internal DNC Class are also entitled to an injunction against future calls. *Id.*

196.   Because each Defendant knew or should have known that its Do Not Call policies were insufficiently implemented when the calls to Plaintiff and the Internal DNC Class were made—and/or willfully caused such calls to be made to Plaintiff and the other members of the Internal DNC Class despite such—the Court should treble the amount of statutory damages available to Plaintiff and the Internal DNC Class, pursuant to Section 227(c)(5) of the TCPA.

WHEREFORE, Plaintiff Robert Hossfeld, individually and on behalf of the Internal DNC Class, respectfully requests that the Court enter judgment against each Defendant for:

A.   Certification of the class as alleged herein;

B.   A declaration that each Defendant violated the TCPA as to Plaintiff and the class;

C.   Injunctive relief aimed at ensuring the prevention of each Defendant from violating the TCPA in the future;

D.   Damages pursuant to 47 U.S.C. § 227(c)(5), as applicable;

E.      Costs, expenses, and attorneys' fees, to the extent permitted by law; and

F.      Such other or further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

                                    Respectfully submitted,

                                    ROBERT HOSSFELD, individually and on
                                    behalf of others similarly situated

Dated: April 13, 2020          By:    _/s/ Scott D. Owens_____
                                    Scott D. Owens (Fla. Bar No. 597651)
                                    SCOTT D. OWENS, P.A.
                                    3800 S. Ocean Dr., Suite 235
                                    Hollywood, FL 33019
                                    Telephone: (954) 589-0588
                                    scott@scottdowens.com

                                    Alexander H. Burke (*pro hac vice*)
                                    BURKE LAW OFFICES, LLC
                                    909 Davis St., Suite 500
                                    Evanston, IL 60201
                                    Telephone: (312) 729-5288
                                    aburke@burkelawllc.com

                                    *Counsel for Plaintiff*

### **Document Preservation Demand**

Plaintiff requests that Defendants preserve all documents, data, emails, testimony and all

other types of evidence or discovery that relates to telemarketing, lead generation and/or the

classes alleged above. This shall not limit the scope of what any Defendant must preserve under

the Federal Rules and applicable case law.

Dated: April 13, 2020          By:    _/s/ Scott D. Owens_____